**03-2870**
**(Judge Braden)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**ASSET 42302 LLC,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# APPENDIX TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---

**PETER D. KEISLER**
**Assistant Attorney General**
**Department of Justice**

**THOMAS J. MARSHALL**
**Managing Counsel**
**Civil Practice Section**
**United States Postal Service**

**MICHAEL FRANCIS KIELY**
**Civil Practice Section**
**Law Department**
**United States Postal Service**
**475 L'Enfant Plaza, S.W.**
**Room 6523**
**Washington, D.C. 20260-1127**
**(202) 268-4037**

**Date: March 19, 2007**

# TABLE OF CONTENTS

| Document | Page |
| --- | --- |
| Declaration of Arthur L. Wallace, Jr. (March 17, 2007) | 1 |
| Excerpts from the Deposition of Joseph Nathanson (June 14, 2006) | 4 |
| Excerpts from the Deposition of J. Leonard Spodek (July 25, 2006) | 14 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ASSET 42302 LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-287C** |
| **v.** | ) | **(Judge Braden)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF ARTHUR L. WALLACE, JR.**

1. My name is Arthur L. Wallace, Jr. I am the post master for the United States Post Office located at 20615 Fenkell Road, Detroit, Michigan 48223-9998, which post office is also known as the Brightmoor Station post office. I have personal knowledge of the matters set forth in this declaration.

2. I have served in the Brightmoor Station post office off and on for approximately 25 years. I was working in the Brightmoor Station post office as Superintendent in 1999 and 2000, and was personally involved in moving postal operations from the old Brightmoor Station post office, located across the street at 20548 Fenkell Road, into the new post office located at 20615 Fenkell Road.

3. I have read the Affidavit of J. Leonard Spodek In Support Of Plaintiff's Motion For Summary Judgment, dated October 19, 2006. In particular, I have considered paragraph 10. In that paragraph, Mr. Spodek claims, among other things, that a male post master at the new Brightmoor Station post office informed Mr. Spodek's colleague, Joseph Nathanson, on



Mar 16 2007 2:41PM HP LASERJET FAX p.2

December 26, 2000, that the Postal Service had not yet vacated the old Brightmoor Station post office.

4. Based upon my knowledge of events at that time, I believe that the statements in paragraph 10 of Mr. Spodek's Affidavit are not entirely correct.

5. First, Mr. Spodek states that Mr. Nathanson was told by the post master that the Postal Service "had not fully moved out of the former Brightmoor Station" as of December 26, 2000. This is incorrect. The move from the old Brightmoor Station post office to the new Brightmoor Station post office, which I personally supervised, took place well before December 2000. To the best of my recollection, the Postal Service had moved all of its property from the old post office to the new post office by September 1999. The formal dedication for the new Brightmoor Station post office occurred shortly after that in November 1999.

6. Secondly, Mr. Spodek's Affidavit refers to the post master, as of December 26, 2000, as being a man. This is also incorrect. The post master at that time was a woman named Janice Giles. Therefore, the Brightmoor Station post master at that time could not have made the statements attributed to the post master in paragraph 10 of Mr. Spodek's Affidavit.

7. I recall escorting a man in late December 2000 across Fenkell Road to examine the old Brightmoor Station post office. However, I did not say to him that the Postal Service "had not fully moved out of" the former Brightmoor Station, because, as stated above, I knew for



Mar 16 2007 2:41PM HP LASERJET FAX p.3

a fact that the Postal Service had moved out of that building in September 1999 and had not re-entered it after that date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on March 17, 2007.

Arthur L. Wallace, Jr.
Post Master, United States Postal Service
Brightmoor Station
Detroit, Michigan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------X

ASSET 42302 LLC, Civil Action No. 03-287C

Plaintiffs. Hon. Susan B. Braden

v.

THE UNITED STATES OF AMERICA, and UNITED STATES POSTAL SERVICE,

Defendants.

-----------------------------------X

Volume I

June 14, 2006

Garden City, N.Y.

Deposition of JOSEPH NATHANSON, taken on behalf of the Defendants, at Rosenberg, Calica & Birney, 100 Garden City Plaza, Suite 408, Garden City, New York, 11530, commencing at 10:14 a.m., June 14, 2006, before Anthony Armstrong, a Certified Shorthand Reporter of the State of New York.

ORIGINAL

A P P E A R A N C E S

ROSENBERG CALICA & BIRNEY
100 Garden City Plaza, Suite 408
Garden City, New York 11530
BY: ROBERT J. HOWARD, ESQ.
Attorneys for Plaintiffs
(516)747-7400

UNITED STATES POSTAL SERVICE
475 L'Enfant Plaza, S.W.
Room 6333
Washington, D.C. 20260
BY: MICHAEL F. KIELY, ESQ.
Attorneys for Defendants
(202)268-4037

I N D E X

| WITNESS | EXAMINATION BY | PAGES |
|---|---|---|
| JOSEPH NATHANSON | Mr. Kiely | 4 |

E X H I B I T S

| EXHIBIT NO. DEFENDANTS | DESCRIPTION | PAGES |
|---|---|---|
| 1 | Second Amended Complaint | 9 |
| 2 | Personal Inspection Report | 28 |
| 3 | Sworn Statement | 32 |

Q. Was it on December 26th, 2000?
A. That's correct.
Q. And you were going to -- what was the purpose of having him visit you at the post office that day?
A. So we could decide definitively on how we would approach a marketing plan, a pricing plan, advertising plan. If he was going to represent us, I wanted him to have actually been inside the building so if somebody called with a question he could answer the question about the property.
Q. Was he a broker from the Detroit area?
A. Yes.
Q. And in fact when you went there on December 26th, 2000, was he present?
A. Yes.
Q. Did he meet you at the building?
A. Yes.
Q. So you flew out from New York City to Detroit on December 26th?
A. That is correct.
Q. And is that the day you traveled?
A. Yes.
Q. About what time did you get to Detroit?
A. Approximately 9 o'clock in the morning.
Q. Okay. And prior to that date, had you

contacted anyone within the Postal Service about your visit?
A. Yes, I did. The answer is yes, I did.
Q. Do you recall who you contacted?
A. No, I don't.
Q. Was it someone in Detroit or somewhere else?
A. No. In Detroit. I remembered it being because they had -- no. It was in Detroit. I'm sure. I can't put a label on it, but I'm sure that it was somebody in the Detroit or in the Detroit facilities office or something to that effect. I wouldn't call Washington to get access to the property.
Q. And so it was either someone in the facilities office in downtown Detroit or in the new post office across the street?
A. That's correct.
Q. And when you traveled out there on December 26th, did you make any contact with anyone from the post office across the street, sir?
A. Yes, I went into the post office across the street.
Q. Did you go in there with your real estate agent?
A. No. He came later.
Q. So when you got to Detroit, did you rent a

car?

A. Yes, I did.

Q. And then you drove over to was it Fenkell Road?

A. That's correct.

Q. And at that point did you -- tell me what you did then, sir.

A. Well, I went to the new post office, the one across the street, and a very nice lady let me sit in the office for about an hour because the Postmaster wasn't in. She wasn't aware or authorized to be able to give me the key for the building across the street, which was empty. I waited about an hour and then the Postmaster came and he gave me a key for the back door of the post office, like the loading dock door.

And it was very interesting. The key said Property of US Post Office. Do not Duplicate. It was stamped like a die stamp on the key.

So I waited -- I went across the street and I waited a few minutes and the broker came. We both went into the building from the back door together.

Q. So you hadn't entered the building prior to the broker's arrival?

A. No. I don't remember -- I don't think so.

Q. And did anyone from the Postal Service

accompany you to the building?
A. No.
Q. They just gave you the key?
A. They gave us the key, yes.
Q. And -- okay. When you got to the building -- was that your first trip to the building?
A. Yes.
Q. You've never been there at any time prior?
A. Never been in Detroit prior to that.
Q. Continue, please, sir, and tell me what happened after you got the key and you attempted to access through the rear of the building.
A. We got in through the rear door and --
Q. I'm sorry to interrupt you.
Isn't there a parking lot there also?
A. There is a parking lot.
Q. Was that open?
A. I don't remember now, to tell you the truth. I know there is a fence around it. And I don't remember -- I may have had to open that parking lot padlock, come to think of it. That may have possibly been so.
Q. Did you have more than one key from the Postmaster?
A. Probably.

The boiler room was maybe twice the size of this room. And that was below grade, but that was the only portion of the property that was below grade.

Q. Was that flooded also?

A. That had some water in it, yes.

Q. And I take it from your complaint and previous statements that the boiler was not in operation?

A. That is correct.

Q. Were you able to ascertain why it wasn't working?

A. No. No, I didn't.

Q. So you entered the boiler room and noticed that it was cold, I guess, is that right? Would that be fair to say?

A. Oh, yes. The boiler was not operating.

Q. And then what happened after that, sir?

A. Well, then this gentleman turned off the water and I took some pictures and basically left the property. We closed it back. I went back to the post office across the street gave them back the keys and went back, I guess.

Q. Paragraph 11 states that upon information and belief, the date of loss was December 20th, 2000. Namely six days before your visit.

Do you know what the basis for that statement

is, sir?
A. No. I assume that it happened sometime prior to my entering the building. And there was an awful lot of water and there was frozen -- what may have led me to that thought was that there was so much water -- there was ice literally coming out the window of the building, so it came to my mind that it must have happened -- the day before was Christmas, so nobody was around. And it may have happened a few days before because it may have taken time for that ice to accumulate and remain ice and not be observed, because the ice was observable from the street.
Q. From the Fenkell Road side of the street --
A. No. The Fenkell side. And somebody walking down the street or looking in that direction would have seen ice coming out the window.
Q. So ice sickles?
A. No, ice. Like an ice flow.
MR. HOWARD: Like an ice sickle?
THE WITNESS: No. An ice sickle represents something thin. This was the width of the window, coming out from the bottom of the window.
BY MR. KIELY:
Q. So there was a glacier coming out of the

were negotiated in this matter in late 2000, early 2001, did you have any substantive role in those negotiations?

A. No.

Q. That was handled by whom for the corporation?

A. Mr. Spodek.

Q. Now, after the property was surveyed by you on December 26th, 2000 and after you made a claim for the insurance in 2001, you received a check from the insurance company, correct?

A. When you say you received --

Q. I mean the corporation.

A. -- you mean the LLC received a check?

That's correct. I personally never saw the check or touched it.

Q. Did the corporation use that money to perform any repairs upon the building?

A. Not to my knowledge.

Q. So the building was then sold to this medical --

A. Organization, yes.

Q. Was sold in more or less in as-is condition?

A. That is correct.

Q. And you are not aware of when the date of that was?

IN THE UNITED STATES DISTRICT COURT
OF FEDERAL CLAIMS
---------------------------------------x
ASSET 42302 LLC,

Plaintiff,

Civil Action
No. 03-287C

-against-

THE UNITED STATES OF AMERICA, and
UNITED STATES POSTAL SERVICE,

Defendants.
---------------------------------------x

DEPOSITION of J. LEONARD SPODEK, taken by the Defendants, on Tuesday, July 25, 2006, at 3:25 p.m., pursuant to Notice, at the offices of Rosenberg Calica & Birney LLP, 100 Garden City Plaza, Suite 408, Garden City, New York, before Dorothy H. London, a Registered Professional Reporter and Notary Public within and for the State of New York.

ORIGINAL

A P P E A R A N C E S:

ROSENBERG CALICA & BIRNEY LLP
Attorneys for Plaintiff
100 Garden City Plaza
Suite 408
Garden City, New York 11530
BY: ROBERT J. HOWARD, ESQ.

UNITED STATES POSTAL SERVICE
Attorneys for Defendants
475 L'Enfant Plaza, S.W.
Room 6333
Washington, D.C. 20260

BY: MICHAEL F. KIELY, ESQ.

------------------- I N D E X ------------------



| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| J. LEONARD SPODEK | Mr. Keily | 5 |



----------------- E X H I B I T S --------------

(NONE MARKED)

SPODEK

Q. Who negotiated those two agreements on behalf of the company?

A. I believe I did.

Q. So Mr. Rothberg or Mr. Nathanson were not involved in that, correct?

A. No.

Q. Let me back up.

At any time after the Postal Service told you, Mr. Spodek, that the Postal Service wanted to leave that building, did you personally make any effort to go out to Detroit to take possession of the building?

A. Did I?

Q. Correct, you.

A. No, but a member of the company did.

Q. You're referring to Mr. Nathanson?

A. Yes.

Q. He went out in late December of 2000, correct?

A. I don't recall the date, but he went out to physically take possession of the keys and to make an inspection.

Q. So you yourself did not go out

SPODEK

there for that purpose at any time?

A. I didn't say at any time. I said I didn't go out there.

Q. So at one point in time, you did go out there --

A. I said I don't recall.

Q. Now, after Mr. Nathanson came back from his visit to the building in Detroit, did he contact you about his visit?

A. Oh, yes.

Q. And if you recall, what did he say to you, sir?

A. He informed me that when they opened up the door to the building to give him the keys and to inspect, he found the entire building flooded and damaged and that as a result of that, he didn't pick up the keys.

Q. Now, prior to his visit to Detroit, did you contact anyone in the Postal Service to tell them that he was going out there to take possession of the building?

A. Yes, arrangements were made. You know, I'm not sure whether I made the arrangements or whether Mr. Nathanson made the

SPODEK

arrangements, but there were arrange -- we didn't appear on the scene without arrangements. There was an appointment made.

Q. Do you recall who was contacted to make that appointment?

A. No.

Q. Now, after Mr. Nathanson came back and gave you his report of his visit to Detroit, did you contact anyone in the Postal Service, Mr. Spodek?

A. I believe I had conversations with the contracting officer.

Q. Which would have been who at that time?

A. I don't recall who signed that agreement, with whoever signed that agreement.

Q. Is that John Brieck?

A. If that's who signed it -- if that's who the signatory was on that agreement, and I told him that as a result of all this damage, we didn't accept the keys. He was aware of it already, and he said he would have to get back to me, and that's when he got back to me and we made a new agreement.

SPODEK

MR. KEILY: Do you have it --

MR. HOWARD: No, it's okay.

THE WITNESS: What's that?

MR. HOWARD: No, nothing, I didn't say anything.

BY MR. KEILY:

Q. If I recall your earlier testimony, you don't recall when that actual sale took place?

A. No, I don't recall the date of the sale.

Q. Has the insurance company in question here contacted you about sponsoring a claim on their behalf at the Court of Federal Claims?

MR. HOWARD: Objection.

A. No, I don't understand the question.

Q. Has the insurance company contacted you about filing a lawsuit on their behalf?

A. Has this insurance company --

Q. Right.

A. -- contacted me in regard to filing a lawsuit, against who?

SPODEK

Q. Against the United States.

A. I've had no contact with the insurance company with regard to this building, this property or this loss.

MR. HOWARD: Just a minute.

(Discussion held off the record between the witness and counsel.)

BY MR. KEILY:

Q. Your testimony is that since you received the proceeds, the $136,695.06, from your insurer, that you've had no contact with them with regard to this matter?

A. No, we've had no contact. And it was very clear at the time, and we deliberated, meaning, the members of the company deliberated in regard to whether we should do the repairs and sell it and get the additional loss, the loss proceeds, or sell it as is, and we decided to sell it as is.

Q. Just so I'm clear before I leave here today, it's your testimony that you're not aware of any document that memorializes your agreement with the insurance company that they would pay you the $58,211.70 under those