# In the United States Court of Federal Claims

No. 03-287C
Filed: July 27, 2007
**TO BE PUBLISHED**

| | |
|---|---|
| ASSET 42302 LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Affirmative Defense, RCFC 8(c);<br>Contract Disputes Act,<br>41 U.S.C. § 601 *et seq.*;<br>Holdover Tenancy;<br>Summary Judgment;<br>RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENANT (1977);<br>Tucker Act, 28 U.S.C. § 1491. |

**Robert J. Howard**, Washington, D.C., counsel for Plaintiff.

**Michael F. Kiely**, United States Postal Service, Washington, D.C., counsel for Defendant.

## I. RELEVANT FACTS.[1]

---

[1] The relevant facts herein were derived from the following portions of the record: Plaintiff's February 10, 2003 Complaint ("Compl.") and exhibits thereto ("Compl. Ex. __"); Plaintiff's June 30, 2003 Amended Complaint ("Am. Compl.") and exhibits thereto ("Am. Compl. Ex. __"); Defendant ("the Government")'s July 29, 2003 Answer ("Answer"); Plaintiff's October 26, 2006 Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Supp. SJ"); Plaintiff's October 26, 2006 Proposed Findings of Uncontroverted Fact ("Pl. PFF") and exhibits thereto ("Pl. PFF Ex. _"); the Government's December 21, 2006 Unopposed Motion For A Stay Of Proceedings Regarding Plaintiff's Motion for Summary Judgment ("Gov't Mot. Stay"); Plaintiff's January 22, 2007 Third Amended Complaint ("Third Am. Compl."); the Government's February 7, 2007 Answer to Plaintiff's Third Amended Complaint ("Gov't Answer to Third Am. Compl."); Plaintiff's February 16, 2007 Supplemental Declaration of Robert J. Howard, in Support of Plaintiff's Motion for Summary Judgment ("Howard Decl.") and exhibits thereto ("Howard Decl. Ex. _"); the Government's March 19, 2007 Cross Motion for Summary Judgment and Response to Pl.'s MSJ ("Gov't Opp. Pl. MSJ and Cross-Mot."); the Government's March 19, 2007 Proposed Findings of Uncontroverted Fact ("Gov't Resp. To PFF") and appendix thereto ("Gov't Resp. To PFF App."); Plaintiff's May 3, 2007 Reply Memorandum of Law in Further Support of Motion for Summary Judgment and in Opposition to the Postal Service's Cross-Motion ("Reply Pl. Supp. SJ"); and the Government's May 25, 2007 Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment ("Gov't Reply").

On June 27, 1991, First Lawrence Partnership leased Brightmoor Station ("old Brightmoor Station Post Office"), a postal facility, to the United States Postal Service ("USPS") in Detroit, Michigan. *See* Pl. PFF Ex. A. The lease on the old Brightmoor Station Post Office ("Lease") was for a ten-year period, September 1, 1991 through August 31, 2001, and had no renewal options. *Id.* Other terms of the Lease provided that:

> (b) The Postal Service is responsible for ordinary repairs to, and maintenance of, the demised premises except for those repairs that are specifically made the responsibility of the Lessor in this lease.
>
> (c) The Lessor is responsible for:
>
> * * *
>
> (2) [A]ll parts of the roof system (including, but not limited to, roof covering, flashing, and insulation);
>
> * * *
>
> (4) Repairs resulting from defects in building construction or installation of equipment, fixtures, or appurtenances furnished by the Lessor; as they pertain to the roof only.

*Id.* Ex. A ¶ 29.

In addition, the Lease provided that:

> [T]he Tenant shall be responsible for the restoration of all damage or injury to the building or any other part of the premises which was caused by or resulted from any wanton or willful act which could be reasonably defined as gross negligence of the Tenant[.]

*Id.* Ex. A ¶ 30.

In April 1997, Asset 42302 LLC ("Plaintiff")[2] purchased the real estate and building of the old Brightmoor Station Post Office from First Lawrence Partnership and assumed the June 27, 1991 Lease. *See* Third Am. Compl. ¶ 8. By September 1999, the USPS moved all Government property from the old Brightmoor Station Post Office into a new facility, located across the street. *See* Gov't Resp. To PFF ¶ 4; Gov't Resp. To PFF App. at 1-2; *see also* Pl. PFF ¶ 7 ("Mr. Nathanson's inspection showed that the Postal Service was no longer using the Brightmoor Station as a postal

---

[2] Asset 42302 LLC is a registered Limited Liability Company under the laws of the State of New York. *See* Third Am. Compl. ¶ 1.

facility and it was unoccupied."); Pl. PFF Ex. D (photographs taken by Mr. Nathanson on his December 26, 2000 visit to the old Brightmoor Post Office). The USPS did not re-enter the old Brightmoor Station Post Office after the September 1999 relocation. Gov't Resp. To PFF App. at 2-3.

On or about November 1, 2000, Plaintiff received notice of the USPS's intent to terminate the Lease effective November 30, 2000. *See* Third Am. Compl. ¶ 10; *see also* Pl. PFF Ex. B ¶ 2. On December 4, 2000, the USPS and Plaintiff entered into the "Detroit, Michigan Brightmoor Station Settlement Agreement" ("Settlement Agreement I"), wherein the parties mutually agreed to terminate the Lease for the old Brightmoor Station Post Office as of November 30, 2000:

> 2. By copy of this agreement, the USPS is formally providing notification to [Plaintiff] that it is moving out of the Detroit, Michigan property on November 30, 2000.
>
> 3. Notification was given by telephone regarding the forthcoming move.
>
> 4. The parties have *mutually agreed to terminate the lease* for the Brightmoor Station, Detroit Michigan facility *effective November 30, 2000.*
>
> 5. The parties subsequently entered into negotiations designed to resolve amicably any claims for rents due in accordance with the termination of the lease mentioned in paragraph 4 above. J. Leonard Spodek acting for Asset 42303 LLC offered to settle the claim and enter into this agreement terminating the lease for the Brightmoor Station, Detroit, Michigan property in exchange for payment by the USPS in the amount of $37,141.29 (inclusive of all interest) plus taxes due for the period of occupancy with each party to bear its own costs, attorney fees, and expenses. As part of the settlement, Mr. Spodek and Asset 42302 LLC agree that they will not file or pursue any claim for restoration, monetary or otherwise, on the Brightmoor Station, Detroit Michigan property.
>
> 6. Upon satisfaction of the terms set forth in paragraph 5, [Plaintiff] releases, waives, and abandons all claims against the United States and the USPS, their officers, agents, and employees, arising out of or related to the claims referred to in paragraph 4 and/or to the termination of the lease, including any restoration claim, on the Brightmoor Station, Detroit, Michigan property, regardless of whether they were included in the claim, including but not limited to any claims for costs, expenses, attorney fees, compensatory damages, and exemplary damages.

Pl. PFF Ex. B ¶¶ 2-6 (emphasis added).

On December 26, 2000, Joseph Nathanson, a principal of Plaintiff, traveled to the old Brightmoor Station Post Office. *See* Pl. PFF ¶ 6*; see also* Gov't Resp. To PFF ¶ 6; Gov't Resp. To PFF App. at 7-8 (Nathanson Dep.). Mr. Nathanson had arranged the visit through a USPS employee who worked either in the facilities office in downtown Detroit or in the new Brightmoor Station Post Office. *See* Gov't Resp. To PFF App. at 7-8. The Superintendant agreed to "lend" Mr. Nathanson a key so that he could perform an inspection of the property. *See* Gov't Resp. To Pl. PFF ¶ 7.

On entering the old Brightmoor Station Post Office, Mr. Nathanson discovered that the hot water boiler was not operating, the interior was not heated, and there was extensive ice and flooding of the facility. *See* Gov't Resp. To PFF App. at 11-12; *see also* Pl. PFF Exs. C, D; Gov't Resp. To PFF ¶ 7. Because of the frozen water, Mr. Nathanson estimated that the damage must have occurred on or about December 20, 2000. *See* Gov't Resp. To PFF App. at 12. The flooding was a result of the copper plumbing pipes freezing and splitting, because the hot water boiler was not running. *See* Pl. PFF ¶ 7; *see also* Pl. PFF Ex. G. Thereafter, Plaintiff prepared and submitted a Personal Inspection Report detailing the USPS's alleged failure to maintain the plumbing system at the old Brightmoor Station Post Office that allegedly caused: (1) flooding of 90% of the interior floor; (2) floor swelling; (3) damaged bathroom fixtures; and (4) water leaking out of the front window to the exterior. *See* Pl. PFF Ex. C, D.

On January 8, 2001, Plaintiff and the USPS signed a second Settlement Agreement ("Settlement Agreement II"), superseding Settlement Agreement I. *See* Pl. PFF Ex. E. The Government agreed to pay Plaintiff $37,141.29, inclusive of all interest. In addition, the following language was deleted from paragraph 5 of Settlement Agreement I: "As part of this settlement, Mr. Spodek and Asset 42302 LLC agree that they will not file or pursue any claim for restoration, monetary or otherwise, on the Brightmoor Station, Detroit Michigan property." *Compare* Pl. PFF Ex. B ¶ 5, *with* Pl. PFF Ex. E ¶ 5. Paragraph 6 of Settlement Agreement II also was amended to remove Plaintiff's waiver of any claims for restoration. *Compare* Pl. PFF Ex. E ¶ 6, *with* Pl. PFF Ex. B ¶ 6. The USPS did not return keys to the old Brightmoor Station Post Office to Plaintiff until on or about January 18, 2001. *See* Gov't Response to PFF ¶ 12; *see also* Gov't Response to PFF App. at 2.

On May 25, 2001, Plaintiff submitted a property damage insurance claim to Memphis Insurance Group. *See* Pl. PFF ¶ 14; *see also* Pl. PFF Ex. G. Memphis Insurance Group retained the engineering services of GAB Robins, a nationally known insurance adjuster. *See* Pl. PFF ¶¶ 14-15. GAB Robins estimated that the total cost of repairs was $195,906.76, and the actual cash value (the total cost of repair less depreciation) was $137,695.08. *See* Pl. PFF Ex. F; *see also* Pl. PFF ¶ 15. Thereafter, Plaintiff was paid $136,695.06, which was the actual cash value minus a $1,000 deductible. *See* Pl. PFF Ex. G; *see also* Howard Decl. Ex. C. The difference between the total cost of repairs and the amount Plaintiff received was $59,211.70. *See* Third Am. Compl. ¶ 19.

On June 13, 2002, Plaintiff filed a claim with the USPS Contracting Officer for damages incurred. *See* Pl. PFF Ex. H. The claim sought payment for: 1) the 10% discount on rent for December 2000 and January 2001 given to the USPS per Settlement Agreement II's specification

that the USPS would not be occupying the old Brightmoor Station Post Office in those months; 2) the reimbursement for municipal taxes due for December 2000 and January 2001, in the amount of $173.73 and $144.11 respectively; 3) the difference in the amount of insurance Plaintiff received and the total loss incurred, *i.e.*, $59,211.70; and, 4) interest on those amounts at a rate of 9% per year. *Id.* Ex. H. On July 25, 2002, the USPS Contracting Officer denied Plaintiff's claim, citing Settlement Agreement II, paragraph 6, releasing, waiving and abandoning all claims upon satisfaction of the terms set out in paragraph 5 of Settlement Agreement II. *See* Pl. PFF Ex. I.

On August 20, 2002, Plaintiff submitted a revised claim for additional damages due for payment of the utilities for the property for December 2000 and January 2001. *See* Am. Compl. Ex. F. On September 9, 2002, Plaintiff's revised claim also was denied:

> This is the final decision of the contracting officer pursuant to the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes. You may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing written notice . . . to the contracting officer within 90 days from the date you receive this decision. . . . Alternatively, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

*Id.* Ex. G.

On November 1, 2002, Plaintiff submitted another letter to the Contracting Officer requesting reconsideration of the claim. *See* Compl. Ex. H. This request went unanswered by the Contracting Officer. *See id.* ¶ 12.

## II. PROCEDURAL HISTORY.

On February 10, 2003, Plaintiff timely filed a Complaint in the United States Court of Federal Claims alleging that the USPS breached Settlement Agreement I by failing to vacate and surrender the old Brightmoor Station Post Office as required therein, *i.e.*, on November 30, 2000. *See* Am. Compl. ¶¶ 4, 6. The case was assigned to the Honorable Emily C. Hewitt. On June 30, 2003, Plaintiff filed an Amended Complaint seeking damages:

> (a) pursuant to the Settlement Agreement paragraph 5, the ten percent discount in rent granted to the USPS for its early vacating must be reimbursed for the months of December 2000 and January 2001; and
>
> (b) pursuant to the Settlement Agreement paragraph 5, the tax reimbursements for December 2000, and January, 2001 must be awarded to Asset 42302 LLC; and

(c) the difference between the insurance payment received by Asset 42302 LLC as a result of the cascading water leak, and the actual loss incurred by Asset 42302 LLC as a result of damage to the premises while under the USPS' control; and

(d) utility (including but not limited gas, electric, water and sewer use[)] payments for December 2000, and January 2001; and

(e) interest upon the foregoing.

*Id.* ¶ 8(a)-(e).

On July 29, 2003, the Government filed an Answer. On August 15, 2003, the case was reassigned to the undersigned judge.

* * *

On June 22, 2005, the court issued an unpublished Memorandum Opinion and Order determining that Plaintiff's Amended Complaint failed to state a legal claim or cause of action. *See* Opinion at 5-6, *Asset 42302 LLC* v. *United States*, No. 03-287C, Dkt. No. 42 (Fed. Cl. June 22, 2005). The court, however, granted Plaintiff leave to file a Second Amended Complaint complying with RCFC 8(a) by September 1, 2005. *Id.* at 6. Plaintiff also was granted leave to amend Plaintiff's Motion for Summary Judgment and Plaintiff's Proposed Findings of Fact. *Id.* The Government was allowed to conform the April 1, 2005 Opposition and Response to Plaintiff's Proposed Findings of Fact within 30 days thereafter. *Id.*

On October 31, 2005, the court granted Plaintiff's Motion for Leave to Substitute Legal Counsel. On December 16, 2005, Plaintiff filed a Second Amended Complaint. The Government filed an Answer on January 17, 2006.

On March 7, 2006, the Government filed a Motion for Extension of Time to file a Joint Preliminary Status Report, which the court granted. On March 10, 2006, the parties filed a Joint Preliminary Status Report. On April 10, 2006, the court issued a Scheduling Order. On June 29, 2006 the court granted the Government's June 20, 2006 Motion to Amend Schedule and established fact discovery due by July 28, 2006; expert discovery due by August 31, 2006; and dispositive motion(s) due by September 29, 2006.

On October 19, 2006, Plaintiff submitted revised claim to the USPS Contracting Officer asserting that the proper amount of damages for the cost to repair the property was $195,906.76, not $59,211.70. *See* Pl. PFF Ex. M; Howard Decl. Ex. B. The increase in damages was the result of a change in legal theory, in that Plaintiff asserted entitlement to recover the full cost to repair the property, not the full cost of repair minus the claim paid by Redland Insurance. *See* Pl. Supp. SJ at 14. The revised claim also included payment for use and occupation in the amount of $8,917 for two

months rent at a rate of $4,300/month, and municipal taxes for December 2000 and January 2001, totaling $173.76 and $144.11 respectively. *See* Pl. PFF Ex. M. Therefore, the total amount of damages claimed was $204,823.76, plus applicable interest. *Id.*

On October 26, 2006, Plaintiff filed a Memorandum of Law in Support of Motion for Summary Judgment and Proposed Findings of Uncontroverted Fact, wherein Plaintiff explained that the $195,906.76 damages claimed reflected the total cost of repairs, assessed by GAB Robbins, instead of the $59,211.70 requested in the Second Amended Complaint, representing the amount of the assessed depreciation of the property, plus the unpaid insurance deductible. *See* Pl. Supp. SJ at 14.

On December 21, 2006, the Government filed an Unopposed Motion to Stay Proceedings until the USPS Contracting Officer issued a final decision on Plaintiff's revised October 19, 2006 claim for $204,823.76. *See* Gov't Mot. Stay at 1-2.

On January 5, 2007, the USPS Contracting Officer denied Plaintiff's revised claim. *See* Howard Decl. Ex. C. The Contracting Officer determined that he did not have jurisdiction to issue a final decision on the portion of the claim pending before the United States Court of Federal Claims. *Id.* Ex. C. With respect to Plaintiff's claim to recover the entire $195,906.76, the Contracting Officer determined that such an action could only be pursued for the use and benefit of Plaintiff's insurer, who paid all but $1,000 of the actual cash value. *Id*.

On January 10, 2007, the court convened a telephone status conference. On January 12, 2007, the court issued an Order staying the case through January 19, 2007, giving Plaintiff until January 22, 2007 to file a Third Amended Complaint to revise the amount of damages claimed. *Id.* Ex. A. The Government was ordered to file an Answer by February 6, 2007. *Id*.

On January 22, 2007, Plaintiff filed a Third Amended Complaint increasing the amount of damages requested. Plaintiff's Third Amended Complaint asserts four claims. The first claim alleges that the USPS breached the Lease by failing to maintain the premises and repair damages caused by negligence, rendering the USPS liable for property damages in the amount of at least $195,906.76. *See* Third Am. Compl. ¶¶ 22-26. The second claim alleges that the USPS committed common law waste, for which it is liable in the amount of at least $195,906.76. *Id.* ¶¶ 27-29. The third claim alleges that the USPS failed to surrender possession or the keys to the old Brightmoor Station Post Office by November 30, 2000, the lease end date stipulated to in Settlement Agreements I and II, which was an illegal holdover. *Id.* ¶¶ 30-34. As a result, the Third Amended Complaint seeks rent and municipal taxes for the months of December 2000 and January 2001 totaling $8,917. *Id.* The fourth claim seeks damages for reasonable attorneys' fees and costs, pursuant to 28 U.S.C. § 2412(d). *Id.* ¶¶ 35-37.

On February 7, 2007, the Government filed an Answer. On February 16, 2007, Plaintiff filed the Supplemental Declaration of Robert J. Howard in Support of Plaintiff's Motion for Summary Judgment.

On March 19, 2007, the Government filed a Cross Motion for Summary Judgment and Response. The Government also filed a Response to Plaintiff's Proposed Findings of Uncontroverted Fact and Defendant's Proposed Findings of Uncontroverted Fact.

On May 3, 2007, Plaintiff filed a Reply Memorandum of Law in Further Support of Motion for Summary Judgment, an Opposition to the Postal Service's Cross-Motion and a Response to Government's Proposed Findings of Uncontroverted Fact. On May 25, 2007, the Government filed a Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment.

## III. DISCUSSION.

### A. Jurisdiction.

The court has jurisdiction, pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601, *et seq*., to adjudicate the claims alleged in Plaintiff's January 22, 2007 Third Amended Complaint. The Tucker Act grants jurisdiction to the United States Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act.").

Under the CDA, the United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under. . . the Contract Disputes Act of 1978 [41 U.S.C. § 601, *et seq*.]." 28 U.S.C. § 1491(a)(2); *see also* 41 U.S.C. § 609(a) ("Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.").

Under the CDA, an aggrieved contractor must exhaust its administrative remedies by filing a claim with, and receiving a final decision from, the contracting officer before it has standing to assert a claim in the United States Court of Federal Claims. *See* 41 U.S.C. § 605(a), (b) (The "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter."); *see also England* v. *The Swanson Group*, 353 F.3d 1375, 1379 (Fed.

Cir. 2004) (holding that "jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim[]"). A "claim" is defined by the Federal Acquisition Regulation ("FAR") as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101; *see also* 48 C.F.R. § 52.233-1(c) (containing the same language). Thereafter, a contractor may bring an action to the United States Court of Federal Claims within 12 months of the contracting officer's final decision. *See* 41 U.S.C. §§ 609(a)(1), (3).

In this case, there is no dispute that a contract existed between Plaintiff and the Government. *See* Pl. PFF Ex. A. In addition, on January 5, 2007 the USPS Contracting Officer issued a final decision regarding Plaintiff's claim. *See* Howard Decl. Ex. C. Accordingly, the court has jurisdiction, pursuant to the Tucker Act and the CDA, to adjudicate the claims asserted in Plaintiff's Third Amended Complaint.

**B. Standard For Summary Judgment – RCFC 56(c).**

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." (citations omitted)). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id*. at 248-50.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing'—that is, pointing out to the [trial court]—that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.* v. *United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the

nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve disputed factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks U.S.A., L.L.C.* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) ("[The court] determines for itself whether the standards for summary judgment have been met." (citations omitted)). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

### C. The Government's Holdover Tenant Argument Is Not An Affirmative Defense.

Plaintiff contends that the Government's argument that it surrendered the old Brightmoor Station Post Office prior to the damage is an affirmative defense that should have been asserted in the Government's February 7, 2007 Answer to the Third Amended Complaint.[3] *See* Reply Pl. Supp. SJ at 2-5.

As a threshold matter, this issue is not covered by the non-exclusive list of affirmative defenses itemized in RCFC 8(c). *See* RCFC 8(c). RCFC 8(c) provides a non-exclusive list of affirmative defenses and concludes "and any other matter constituting an avoidance or affirmative

---

[3] Plaintiff asserts that "[i]t is well settled under general principles of landlord and tenant law, the surrender of a premises in order to avoid liability to the landlord under a lease is an affirmative defense for which the *tenant* bears the burden of pleading and proving." Reply Pl. Supp. SJ at 1. In federal court, however, principles of federal law prevail with respect to this issue. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1271 (3d ed. 2007) ("WRIGHT & MILLER") ("[F]ederal courts are not bound to treat a matter that is considered or specifically identified as an affirmative defense under forum state law as an affirmative defense for purposes of pleading under Rule 8(c), even in diversity of citizenship cases; the matter is governed by federal pleading principles.").

defense." RCFC 8(c).[4] Because there is no definitive authority as to which defenses fall under this residuary clause, courts generally consider "two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by simple denial in the answer." WRIGHT & MILLER § 1271; *see also Bull* v. *United States*, 68 Fed. Cl. 212, 272 n.66 (2005) (analyzing whether a defense constitutes an affirmative defense pursuant to the criteria provided by WRIGHT & MILLER § 1271); *Statham* v. *United States*, No. 00-699C, 2002 WL 31292278, at *10 (Fed. Cl. Sept. 11, 2002) (same).

The Government's argument with respect to the USPS's status as a holdover tenant does not meet either of these criteria. First, the Government's holdover tenant argument does not "admit the allegations of the complaint but suggest some other reason why there is no right to recovery." *See* WRIGHT & MILLER §1271. In this case, the Government expressly denied Plaintiff's allegation that the USPS was a holdover tenant. *See* Answer ¶ 6; *see also* Gov't Answer to Third Am. Compl. ¶¶ 30-33. Second, the Government's holdover argument does not "concern allegations outside of the plaintiff's prima facie case[.]" WRIGHT & MILLER § 1271. Without establishing that the USPS was a holdover tenant, Plaintiff has no basis for liability. Finally, Plaintiff cannot credibly claim to be surprised by the Government's argument. *Id.* ("Another highly relevant consideration is whether the plaintiff will be taken by surprise by the assertion at trial of a defense not pleaded affirmatively by defendant."). The Government has denied Plaintiff's allegation that the USPS was a holdover tenant since the inception of this litigation. *See* Answer ¶ 6; *see also* Gov't Answer To Third Am. Compl. ¶¶ 30-33.

For these reasons, the court has determined that whether the USPS surrendered the old Brightmoor Station prior to the property damage is not an affirmative defense, pursuant to RCFC 8(c).

---

[4] RCFC 8(c) provides:

> Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

RCFC 8(c).

### D. The Parties' Cross-Motions For Summary Judgment.

#### 1. Overview of the Parties' Cross-Motions For Summary Judgment.

Plaintiff argues that the USPS breached paragraph 29 of the Lease, which delegated responsibility to the USPS for repairs and maintenance to the "demised premises." *See* Pl. Supp. SJ at 7-8 (quoting Pl. PFF Ex. A ¶ 30). Under the Lease, the USPS was responsible "for ordinary repairs to, and maintenance of, the demised premises except for those repairs that are specifically made the responsibility of the Lessor," such as repairs to the roof. *Id.* at 8. Plaintiff claims that paragraph 30 of the Lease imposes liability on the USPS for "restoration" costs in the amount of the full cost of repair, calculated to be $195,906.76. *Id.* at 10-11. In the alternative, Plaintiff requests that the court find the USPS liable for the cost of repair, less depreciation in the amount of $137,695.06. *Id.* at 12-13. Plaintiff also requests that the court hold, as a matter of law, that the USPS is liable for use and occupation for holding over beyond November 30, 2000, the date stipulated as the lease termination date in Settlement Agreements I and II. *Id.* at 16-17. Plaintiff asserts that the USPS is liable for rent and municipal taxes for the months of December 2000 and January 2001, because the old Brightmoor Station Post Office was not vacated until January 18, 2001, when the USPS delivered the keys to Plaintiff. *Id.*

On March 19, 2007, the Government filed a Response and Cross-Motion for Summary Judgment, requesting that the court rule, as a matter of law, that the USPS was not a holdover tenant at the time the damage to the building occurred, because: (1) a tenant's failure to return keys does not constitute a holdover; and (2) the USPS terminated the lease and vacated the old Brightmoor Station Post Office before the damage occurred on December 20, 2000. *See* Gov't Opp. Pl. MSJ and Cross-Mot. at 8-12. In the alternative, even if deemed a holdover tenant, the Government argues that Plaintiff is not entitled to recover for the full cost of repair less depreciation, because Plaintiff is not pursuing the action on behalf of the use and benefit of the insurer. *Id.* at 12. Finally, the Government asserts it is not liable for the depreciation of the property in the amount of $59,211,70. *Id.* (citing *Container Co.* v. *United States*, 90 F. Supp. 689, 693-94 (Ct. Cl. 1950)).

#### 2. The Government Was Not A Holdover Tenant.

##### a. The Parties' Arguments.

Plaintiff argues that on December 20, 2000, when the flooding of the property occurred, the USPS was acting as a holdover tenant, and is liable under the Lease for the damage caused by the broken pipe. Plaintiff argues that the USPS's decision to vacate the old Brightmoor Station Post Office in September 1999 did not effect a legal surrender of the property because the Lease was not terminated, and so there was no mutual agreement between the parties to surrender at that time. *See* Pl. PFF ¶ 4; Reply Pl. Supp. SJ at 7-8 (citing *M & V Barocas* v. *THC, Inc.*, 549 N.W.2d 86, 88 (Mich. Ct. App. 1996) ("Surrender of a lease involves more than mere abandonment of the premises by the tenant; it requires a mutual agreement between landlord and tenant to terminate the lease."); *Pyle* v. *Orzell*, 86 N.W.2d 163, 166 (Mich. 1957) ("Mere vacating or abandonment of the premises

does not of itself act to exonerate the tenant or operate as a surrender [citation omitted]; mutual agreement to terminate the original lease must also be made out.")). Plaintiff explains that Settlement Agreements I and II only served to abbreviate the Lease term and settle the landlord's claims for unpaid rent, but did not surrender legal possession of the old Brightmoor Station Post Office because the USPS retained keys to the premises and there was forward-looking language in the Agreements indicating the USPS did not intend to immediately surrender the old Brightmoor Station Post Office. *Id.* at 8-11 ("The effect of the December 2000 Settlement Agreement was that, in consideration for the $37,141.29 payment, the Lease term was to abbreviated to [sic] November 30, 2000, giving the Postal Service an option to terminate it had not originally bargained for."). Plaintiff concludes that the USPS's failure to return the keys when Mr. Nathanson requested them during his December 26, 2000 visit evidenced an affirmative refusal to surrender the property. *See* Reply Pl. Supp. SJ at 6. Accordingly, the USPS did not vacate the old Brightmoor Station Post Office until on or about January 18, 2001, when the USPS returned the keys to Plaintiff, and is therefore liable for the damage incurred on December 20, 2000. *See* Pl. PFF ¶ 12.

The Government responds that vacating the old Brightmoor Station Post Office in September 1999, in conjunction with the termination of the Lease in Settlement Agreement I, effected a legal surrender of the property, and therefore the Government is not liable for damage that occurred to the property after November 30, 2000. *See* Gov't Opp. Pl. MSJ and Cross-Mot. at 8-9; *see also* Gov't Reply at 4 ("It is [the Government]'s position that removal of its equipment from the building in 1999 coupled with [Settlement Agreement I] effected a surrender of the premises."). The Government argues that Settlement Agreement I expressly states that the USPS "is moving out of the [old Brightmoor Station Post Office] on November 30, 2000." Gov't Reply at 4. Accordingly, all of the Government's equipment was moved to the new Brightmoor Station Post Office in September 1999. *See* Gov't Opp. Pl. MSJ and Cross-Mot. at 11 (citing Gov't Resp. To PFF App. at 1-2). The Government explains that retention of the keys after the Lease termination date of November 30, 2000 is not sufficient to constitute a holdover tenancy. *See* Gov't Opp. Pl. MSJ and Cross-Mot. at 8-9. Moreover, no additional notice of surrender to Plaintiff was necessary other than Settlement Agreement I, which functioned as notification of the Government's surrender of the property. *See* Gov't Reply at 4.

**b. Governing Law Concerning The Surrender Of A Tenancy.**

The surrender of a tenancy is governed by established common law principles. *See generally Sun Cal, Inc.* v. *United States*, 25 Cl. Ct. 426, 429-31 (1992) (discussing the common law origin and evolution of lease contracts and surrender). The United States Supreme Court has defined surrender of a tenancy as:

> yielding up the estate to the landlord, so that the leasehold interest becomes extinct by mutual agreement between the parties. It is either in express words, by which the

> lessee manifests his intention of yielding up his interest in the premises, or by operation of law, when the parties without express surrender do some act which implies that they have both agreed to consider the surrender as made.

*Beall* v. *White*, 94 U.S. 382, 389 (1876) (citation omitted).

To execute a surrender, *i.e.*, to terminate a lease before its expiration, the landlord and tenant must establish there has been a "mutual agreement between the parties" to extinguish the leasehold interest. *Id*. The United States Court of Appeals for the Seventh Circuit has held that the mutual agreement requirement for surrender must demonstrate that "an agreement had been reached whereby the lessee surrendered the premises and the lessor accepted the premises back*, both intending thereby to terminate the lease and cancel all the covenants and obligations thereunder*." *Checkers, Simon & Rosner* v. *Lurie Corp*., 864 F.2d 1338, 1346 (7th Cir. 1988) (quoting *Solomon* v. *Geller*, 198 N.E.2d 210, 214 (Ill. App. Ct. 1964) (emphasis added)).

Surrender can be accomplished "either in express words, by which the lessee manifests his intention of yielding up his interest in the premises, or by operation of law, when the parties without express surrender do some act which implies that they have both agreed to consider the surrender as made." *Beall*, 94 U.S. at 389 (citations omitted). In addition, the landlord must accept the surrender of the premises proffered by the tenant. *See M & V Barocas*, 549 N.W.2d at 88 (Mich. Ct. App. 1996) ("No surrender occurs where the landlord refused to accept the tenant's surrender of the premises.") (citation omitted). When the parties have expressed what constitutes surrender of the leasehold, the court must follow this expression. *See Nat'l Aircraft Maint. Corp.* v. *United States*, 171 F. Supp. 946, 949 (Ct. Cl. 1959). The party asserting surrender of the lease bears the burden of proving surrender. *See M & V Barocas*, 549 N.W.2d at 88 ("The burden of proving surrender is on the party asserting surrender.") (citation omitted).

A tenant who does not surrender possession of the leased property, but "retains possession of the premises after the term expires," is a holdover tenant, as a matter of law. *See* RESTATEMENT (SECOND) OF PROP.: LANDLORD & TENANT § 14.2, Reporter's Note to Section 14.2, Note 6 (1977) (citations omitted). The determination of whether a tenant is holding over is a question of fact. *Id.* If the USPS was a holdover tenant at the time of the damage to the premises, the terms of the original lease agreement apply, and the USPS is liable for the damage. *See Yachts Am., Inc.* v. *United States*, 673 F.2d 356, 365 (Ct. Cl. 1982) ("[W]hen a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply.") (citation omitted); *see also* Pl. PFF Ex. A ¶¶ 29-30.

**c. The Court's Resolution.**

In this case, the USPS moved all Government property out of the old Brightmoor Station Post Office as of September 1999. *See* Gov't Resp. To PFF ¶ 4; *see also* Gov't Resp. To PFF App. at 1-2. Of course, mere abandonment of the property does not constitute surrender. *See Beall*, 94 U.S. at

389 (requiring a "mutual agreement between the parties" to extinguish the leasehold interest). On December 4, 2000, however, the parties entered into Settlement Agreement I, that provides:

> 2. By copy of this agreement, *the USPS is formally providing notification to [Plaintiff] that it is moving out of the Detroit, Michigan property on November 30, 2000*.
>
> 3. Notification was given by telephone regarding the forthcoming move.
>
> 4. The parties have *mutually agreed to terminate the lease* for the Brightmoor Station, Detroit Michigan facility *effective November 30, 2000.*

Pl. PFF Ex. B ¶¶ 2-6 (emphasis added).

Accordingly, the terms of Settlement Agreement I unambiguously evidence a mutual agreement to terminate the lease on November 30, 2000, effectuating a legal surrender of the leasehold interest and cancelling all covenants thereunder. *See Beall*, 94 U.S. at 389 (requiring a "mutual agreement between the parties" to extinguish the leasehold interest); *see also Checkers, Simon & Rosner*, 864 F.2d at 1346 (stating that surrender requires "an agreement . . . whereby the lessee surrendered the premises and the lessor accepted the premises back*, both intending thereby to terminate the lease and cancel all the covenants and obligations thereunder*.") (emphasis added and citation omitted).

In an effort to obviate Settlement Agreement I, Plaintiff advances several arguments that require a response. First, Plaintiff argues that the effect of Settlement Agreement I was to create an option for the USPS to terminate the lease on November 30, 2000. *See* Reply Pl. Supp. SJ at 8 ("The effect of [Settlement Agreement I] was that . . . the lease term was abbreviated to November 30, 2000, giving the Postal Service an option to terminate [the lease.]"). This characterization, however, is contradicted by the express language of the Agreement that provides: "[t]he parties have mutually agreed to terminate the lease[.]" Pl. PFF Ex. B ¶ 4.

Second, Plaintiff argues that certain "forward-looking" language in Settlement Agreement I, and repeated in Settlement Agreement II, evidences that the USPS did not intend to relinquish legal possession of the old Brightmoor Station Post Office when it signed Settlement Agreement I. *See* Reply Pl. Supp. SJ at 8-11. Plaintiff cites language in Settlement Agreement I, signed on December 4, 2000, stating that the USPS "is moving out" and that there will be a "forthcoming move" to demonstrate that the USPS did not intend to surrender the old Brightmoor Station Post Office on November 30, 2000 by signing Settlement Agreement I. *See* Pl. PFF Ex. B ¶¶ 2-3. This language could be read to state that the USPS intended to move out of the old Brightmoor Station Post Office some date after signing Settlement Agreement I. When viewed in the context of the dealings of the parties, it is clear that Settlement Agreement I was to extinguish the leasehold estate on November 30, 2000 and surrender the old Brightmoor Station Post Office on that date, particularly because an express provision of the Agreement terminated the lease effective November

30, 2000. *See* Pl. PFF Ex. B ¶ 4 ("The parties have mutually agreed to terminate the lease . . . effective November 30, 2000."); *see also Beall*, 94 U.S. at 389 (defining "surrender" as "the yielding up the estate to the landlord, so that the leasehold interest becomes extinct by mutual agreement between the parties" (citation omitted)). Moreover, Settlement Agreement I also stated that "[b]y copy of this agreement, the USPS is formally providing notification to [Plaintiff] that it is moving out of the Detroit, Michigan property *on November 30, 2000*." *Id*. Ex. B ¶ 2 (emphasis added). Finally, the USPS's decision to move out of the facility as of September 1999, and not using the facility thereafter, further evidences the intention of the parties to surrender the lease tenancy on November 30, 2000, not some unknown date in the future. *See* Gov't Resp. To PFF ¶ 4; *see also* Gov't Resp. To PFF App. at 1-2.

Third, Plaintiff argues that by retaining the keys subsequent to vacating the old Brightmoor Station Post Office, the USPS intended to remain in legal possession of the premises, and therefore Settlement Agreement I did not effect a surrender of the leasehold. *See* Third Am. Compl. ¶ 32; *see also* Reply Pl. Supp. SJ at 13-18. As a matter of law, however, when a tenant "merely retains the keys to the premises," the tenant does not become a holdover tenant. *See* RESTATEMENT (SECOND) OF PROP.: LANDLORD & TENANT § 14.2, Reporter's Note to Section 14.2, Note 6 (1977). If a tenant retains the keys to the premises, the court must examine the circumstances in their totality, looking to other factors to determine if the tenant should be deemed a holdover tenant. *See Hoopes* v. *Prudential Ins. Co.*, 362 N.E.2d 802, 805 (Ill. App. Ct. 1977) (holding that even though the tenant retained the keys, the tenant was not a holdover tenant because the tenant provided the landlord with notice he was moving out and the tenant had actually moved out); *see also Four "S" Alliance, Inc.* v. *Am. Nat'l Bank & Trust Co.*, 432 N.E.2d 1213, 1217-18 (Ill. App. Ct. 1982) (holding that the tenant was not a holdover tenant, despite retaining keys, because the tenant recognized the termination of the tenancy, relinquished possession of the premises and the landlord was able to gain access to the property); *Brennan* v. *City of New York*, 80 A.D. 251, 253 (N.Y. App. Div. 1903) (holding that where the landlord was aware the tenant had moved out, a tenant who attached a lock to the door and accidentally retained the keys to the lock was not a holdover tenant).

Finally, Plaintiff contends that the USPS did more than merely neglect to return the keys to the old Brightmoor Station Post Office, but that it "*affirmatively refused* to unconditionally turn them over when specifically asked for them by the landlord's principal, in person, agreeing only to *lend* the keys[.]" Reply Pl. Supp. SJ at 13 (emphasis in original). Plaintiff asserts that this affirmative refusal to return the keys demonstrates the USPS's intent to remain in possession of the old Brightmoor Station Post Office after signing Settlement Agreement I. *Id*. Both the cases Plaintiff relies on to establish that the USPS's actions constituted an affirmative refusal have no precedential effect and, furthermore, can be distinguished from the instant case.

In *Brunswick Corp.* v. *Goodie Investments*, 451 S.W.2d 421 (Ky. Ct. App. 1970), the court held that an agreement to terminate a lease does not constitute surrender of the premises, when the tenant withholds the keys to the property from the landlord and takes affirmative steps to bar the landlord from reentering the property. *Id*. at 422. *Brunswick* also involved a commercial lease of property that was severely damaged by a flood. *Id*. at 421. As a result, the premises were no longer

suitable for the purpose for which they were leased, and the tenant informed the landlord in writing that it was exercising the right under the lease to cancel the contract. *Id*. After cancelling the lease the court determined that the tenant retained constructive possession of the property. *Id.* at 422. In support, the court noted that the landlord sent written notice on three separate occasions to the tenant that the tenant was retaining possession of the property after the lease had purportedly been cancelled. *Id*. In addition, the tenant gave its representative "instructions not to deliver [the keys to the premises to the landlord] and instead to lock the premises. *Id*. In fact, the tenant had "chained and padlocked the doors so that [the landlord] would have to break the locks to enter the premises for the purpose of effecting repairs and mitigating its damage." *Id*. at 421. In this case, the USPS took no affirmative steps to bar Plaintiff from reentering the property at any time. *See* Gov't Resp. To PFF App. at 7-8; *see also* Gov't Reply at 5.

The other case relied upon by Plaintiff is *Fishel's Estate* v. *Baronelli, Ltd.*, 463 N.Y.S.2d 1009 (N.Y. Civ. Ct. 1983), where a landlord and tenant entered into a five-year commercial lease. Two weeks after signing the lease, the tenant notified the landlord that the property was unsuitable for his needs and never moved in. *Id.* After receiving this notice, the landlord informed the tenant that the property would be released as soon as another tenant was found. *Id.* at 1010. The landlord found a new tenant and asked the original tenant to terminate the lease and return the keys. *Id.* The tenant refused until a portion of the rent was refunded. *Id.* As a result, the landlord lost the new tenant and commenced a proceeding to remove the tenant. *Id.* That court held the tenant was in legal possession of the property, because there was a lease agreement entitling the tenant to a legal right to possession of the property. *Id.* Furthermore, the court relied on the fact that the tenant refused to return the keys as evidence that the tenant did not intend to relinquish possession of the premises. *Id.* In this case, the USPS terminated the Lease by signing Settlement Agreement I. *See* Pl. PFF Ex. B. In *Fishel's Estate* the tenant's refusal to terminate the lease agreement was the main factor in the court's holding that the tenant retained legal possession of the property. *See Fishel's Estate*, 463 N.Y.S.2d at 1010. The refusal to return the keys was viewed as additional evidence that the tenant did not intend to relinquish the property. *Id.* In this case, even though the USPS did not return the keys until on or around January 18, 2001, the Plaintiff already had surrendered the lease by agreeing to the terms of Settlement Agreement I. *See* Gov't Resp. To PFF ¶ 12; *see also* Gov't Resp. To PFF App. at 2; Pl. PFF Ex. B.

Accordingly, the USPS's retention of the keys does not amount to constructive possession of the old Brightmoor Station Post Office after signing Settlement Agreement I. In this case, the USPS had terminated the lease by signing Settlement Agreement I. *See* Pl. PFF Ex. B. Moreover, the USPS's decision to merely lend the keys to Mr. Nathanson during his December 26, 2000 visit was not an attempt to retain legal possession of the old Brightmoor Station Post Office. *See* Pl. PFF ¶ 6; *see also* Gov't Resp. To PFF ¶ 6.

Accordingly, the court has determined that, as a matter of law, the USPS surrendered the old Brightmoor Station Post Office on November 30, 2000, at which time the lease tenancy was extinguished. Accordingly, the USPS was not a holdover tenant at the time of the flooding of the old Brightmoor Station Post Office, on or around December 20, 2000.

## IV. CONCLUSION.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied. The Government's Cross-Motion for Summary Judgment is granted in part. Because the court has determined that the Government was not a holdover tenant at the time of the damage to Plaintiff's property, the remainder of the Government's Motion for Summary Judgment is moot. The Clerk of the Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**